[L. A. No. 32.   Department One.—December 18, 1895.]

IN THE MATTER OF THE ESTATE OF PIERRE CLOS, DECEASED.

ESTATES OF DECEASED PERSONS—ACCOUNTS OF EXECUTOR—NECESSARY RE-
PAIRS AND IMPROVEMENTS.—Although, as a general rule, executors and
administrators are not required nor permitted to make permanent im-
provements upon the property of the estate in their charge, in the way
of erecting new buildings and structures; yet that rule does not apply
where repairs and improvements are absolutely necessary to keep the
premises in good tenantable condition, and the improvements are ren-
dered necessary by the requirements of a city ordinance over which
the executrix has no control, and were made in good faith to the increase
of the value of the property; and, in such case, the executrix should
be allowed for the repairs and improvements upon the real estate be-
longing to the estate.

ID.—PRINCIPLE OF EQUITY—REASONABLE EXPENDITURES BY EXECUTOR.—
Where the estate has received the full benefit of expenditures, which
have been reasonably made by an executrix, it is inequitable to hold
that the executrix is not entitled to reimbursement; and the acts of an
executor or executrix in the administration of the trust are to be ad-
judged according to the rules and principles of equity.

ID. — PERMISSION OF COURT—ALLOWANCE OF ACCOUNT. — Although it is
better practice for an executor first to procure the permission of the
probate court to make a needed improvement, before proceeding thereto,
yet this is not an indispensable condition to the allowance of the de-
mand in the settlement of the executor's account, where it appears that
the expenditures were just and reasonable, and were made in the inter-
est of the estate.

APPEAL from a judgment of the Superior Court of
Los Angeles County.   W. H. CLARK, Judge.

The facts are stated in the opinion of the court.

*McKeeby & Appel*, and *J. Brosseau*, for Appellant.

The executrix had power to make the improvements
in question.   The only measure of her duty was to act
with fidelity, and with that degree of prudence and dili-
gence which a man of ordinary judgment would be ex-
pected to bestow upon his own affairs of a like nature.
(Code Civ. Proc., sec. 1452; *Estate of Rose*, 80 Cal. 166;
*Estate of Moore*, 96 Cal. 522.)

*George D. Blake,* for Respondent.

The allowance or disallowance of expenditures by an executrix without the order or consent of the court, is within the discretion of the court, and will not be reviewed at all unless it is clear that the discretion has been abused, and the burden of proving the necessity of the expenditures is on the executrix. (*In re Moore,* 88 Cal. 1; *Fuller* v. *Fuller,* 23 Fla. 236.)

VAN FLEET, J.—Among the items of the account filed by the executrix of the estate were these:
" By payment to Frank J. Capitan, for archi-
    tectural services, general contract, brick
    work, plumbing, etc., for repairing and
    building stables at No. 24 Aliso street.....$2,611.74
" By services of said Capitan for preparing
    plans for said building.................          130.53"
Upon the settlement of the account the court below rejected and disallowed these items, upon the ground, as stated in the bill of exceptions, " that the said items were not a proper charge of the said executrix against the said estate"; and the only question involved in the appeal, which is taken by the executrix, is the propriety of the action of the court in that regard.

The evidence in support of the rejected items was wholly uncontroverted, and was, in substance, this:

The executrix testified: The estate is the owner of an undivided one-half of certain premises situate at Nos. 24 and 26 Aliso street. I am the owner of the other undivided one-half in my own right. At the time of the death of Pierre Clos, and long prior thereto, on a part of the premises, to wit, the yard immediately back of the front of the said building, which front part is used as a lodging-house and saloon and restaurant, there were some structures used as stables, which had been built a great many years before the death of Pierre Clos, my husband, and the structures were old and decayed, and had been repaired from time to time. The stalls for horses, and the sheds for carriages, had no

flooring. The roofs were of poor material. There were no brick walls inclosing the stable, and there was an adobe wall on the east side, which had been built there for years, and had been broken down, and was nearly tumbling over. The stables were inclosed by an adobe wall, and partly by a picket fence. The picket fence was old and rotten, and the adobe wall had been partly torn down by the water which had accumulated in the yard, and forced itself into the premises of the occupants of the surrounding property. There was no sewerage on the premises, and when it rained the water accumulated there, and rendered the place very muddy, and almost unfit for the occupation of the premises as a stable. The roofs over the stalls were in such condition that whenever it rained the horses would get wet, and the stalls rendered unfit for occupation. From time to time there were a great many complaints made to me by the neighbors, and the authorities of the city of Los Angeles also made complaint to me that the premises were a nuisance, and that they had to be repaired, or the stables abandoned and removed. The stench was of such character that it made all the neighbors complain, and was almost unbearable. I had been paying considerable money for repairing the premises from time to time, but every year they had to be repaired over and over again, and my tenants who occupied the lodging-house and the saloon immediately above and in front of the stables, threatened to leave the place unless I repaired it in such a way that the water would have an outlet, and the stables were fixed in such a condition that they would keep perfectly free and clean from unbearable smells or odors. Mr. Valdez, who was then occupying the premises for stables, complained to me from time to time, and finally, in 1890, during the rainy season, he notified me that he would leave the premises unless I repaired them. I consulted a number of architects and builders, who gave me estimates in reference to the cost and expense of repairing the stables, and Mr. Capitan gave me the lowest bid. I wanted simply

to repair the stables with lumber, and to put on shingle roofs, but that part of the city where the stables are situated was included within the exterior limits fixed by the fire ordinance of the city of Los Angeles, and by that ordinance I could not put up a frame building or frame structure, or any repairs built of lumber, without the permission of the city authorities, and they absolutely refused to allow me to make the repairs in any other manner than as I repaired them. I was required to build fire walls, and to put on fire-proof roofs over the stables. The stalls had to be built over again, as well as flooring put into them, so that they could be kept clean, and free from odors or bad smells. The carriage repository also had to be rebuilt, and that was built of metal and iron, as well as the hay barn. The whole work was done well and skillfully, and was cheap at the price I paid. The two items, to wit, the sums of two thousand six hundred and eleven dollars and seventy-four cents, and of one hundred and thirty dollars and fifty-three cents, appearing in my account as having been paid to Mr. Capitan, were paid for one-half the work done in repairing and constructing the stables, the total sum being five thousand four hundred and eighty-four dollars and fifty-four cents, the other half being paid by me. The work I considered absolutely necessary so as to keep up the premises as a stable. The front part of the lot is only about thirty-eight feet, and this space is taken up with an entrance to the back yard of the lot, which is used as a stable, and a small portion as an entrance to the saloon, which is built running into the lot from the front of the building, so that the lot is very wide at the rear, with a very narrow frontage, and could not have been kept for any purpose except a stable. The premises had been occupied as a stable for years back, as far as I can remember, and it was a well-known stand as a stable, and could not have been rented for any other purpose. If I had not repaired the stable, and had left the old sheds and old rotten lumber upon the premises, the saloon, restaurant,

and lodging-house could not have been kept rented, by reason of the bad condition of the premises. Since I repaired the stable they have been constantly rented, and have produced good rents. So has the saloon and the lodging-house. The insurance on the premises has been reduced considerably, and the property is of far greater value by reason of the building of the stables as they are now than it was before. I could not have received any rent from the premises except by doing the work that I did do.

The architect testified: I was the architect and supervised the building of the stables at No. 24 Aliso street for the executrix. I saw the stables as they stood there before I did the work. They were totally unfit to be occupied as a stable, both from a sanitary point of view and from a financial point of view. I do not believe the stables, as they stood there before my work was done, should have been kept for stable purposes. The stalls were old and rotten. The roofs were tumbling down and were decayed. The floors were all of mud, and were in such a condition that a person could not retain his health and work on the premises. When it came to figuring how the stable should be rebuilt we were confronted by the city ordinance of the city of Los Angeles, which would compel us to put on fire-proof roofs and fire-proof walls, and extend them up on three sides to conform to the requirements of the city ordinance. I figured on the work and put it down as low as possible. The work had to be done, or else the stables had to be abandoned. I consider the expenditure an absolutely necessary one and very reasonable. The work is fully worth the money. The stable could not be built in any other manner than as we built it. I have heard the statement by the executrix here in court, and I consider it a fair, full, and true statement of the circumstances under which these stables were built. The work renders the place a pure, healthy, clean business place, and I consider that the value of the premises has been greatly added to by the work.

Mr. Valdez testified: I was occupying the premises for a number of years. I was there when the repairs were made. I considered that the stables could not have been repaired in any other manner than they were repaired. The work was absolutely necessary, and the price paid for repairing the stables is reasonable. I never saw the premises kept for any other purpose than for stable, saloon, lodging-house, and restaurant. The front part of the lot is narrow, and the back part is very wide. Aliso street is not fit for anything else than stables, lodging-houses, saloons, and restaurants. It is in that part of the city which is next to wholesale houses, and it is not a residence portion of the city. The lodging-houses are occupied by workingmen generally. Aliso street is a thoroughfare for people residing east of the city out in the country, and these premises were occupied as a stable for a great many years. Before the repairs were made the property was absolutely in a totally unfit condition for use. The roofs were old and decayed, were tumbling down, and it was dangerous to leave horses at night in the stables whenever it was rainy, or when it was windy, for fear they would be killed. There was no place to keep carriages, for fear the water would pour on them and damage them. The floors were in a muddy condition, and a person would have to wade through the mud and water to get to the stalls and carriages, and carriages and horses could not be kept clean. I made several complaints to Mrs. Escallier that the premises had to be repaired or I should move. The neighbors were complaining of the bad odors and smells arising from the premises. I was threatened with suits for maintaining nuisances. The stables were repaired from time to time, until, in 1890, I made up my mind to leave the premises or have them repaired. So I notified Mrs. Escallier.

Mr. Sabichi, the agent of the executrix for the buildings, testified: I know the premises in question. I know when the repairs were made. I was her agent at the time. I consulted with a number of architects and

builders as to the proper manner of repairing the stables. The repairs were absolutely needed, and, after consulting with them all, I thought that the bid put in by Mr. Capitan was the lowest and most reasonable. I have examined the work done, and I consider it very good, and the value of the property greatly added to by the work done.

It does not clearly appear from the record upon what ground the learned judge of the court below based his action in the premises, as no specific findings were made, and the only reason stated is the general one found in the order settling the account, that the rejected items were not proper charges against the estate. From expressions in the brief of respondent, however, we infer that the items were disallowed because the court adopted the view now taken by the respondent that the alterations made in the building in question were deemed to be more in the nature of the erection of a new building than the repair or improvement of an old one, and that such expenditure was not for that reason the subject matter of a proper charge against the estate.

It is perfectly true, as a general proposition, that executors and administrators are not required nor permitted to make permanent improvements upon the property of the estate in their charge, in the way of erecting new buildings or structures, and that expenditures made for such purposes will not be allowed; and the only question is whether that rule in its strictness should be applied to the facts of this case. We are constrained to think that it should not. If the case were one where the executrix had proceeded to erect buildings or other permanent improvements upon a vacant lot or unoccupied piece of land of the estate, it would no doubt fall strictly within the rule contended for. But such is not this case. Here the intention and purpose of the executrix was to improve and put in repair premises for many years devoted to a particular use, and from which the estate was deriving an income, for the purpose of keeping those premises from being

abandoned, and the income being lost to the estate.
The statute made it her duty to "keep in good, tenant-
able repair all houses, buildings, and fixtures" upon the
real estate belonging to the estate. (Code Civ. Proc.,
sec. 1452.) The repairs in this instance, it is true,
involved practically a rebuilding of the structure rather
than a repair thereof in its strict sense, and perhaps in
a purely legal sense, and for other purposes, would be
so considered. But the extensive character of the work
done would seem to have been largely rendered neces-
sary by the requirements of the city ordinance—a mat-
ter over which the executrix had no control.

No question is made of her perfect good faith in
the premises, and it appears that by the repairs and
improvements made the property has been largely en-
hanced in value, and has been bringing in a steady
income since the completion of the alterations made;
of all which the estate has had the benefit. The work
appears to have been done only after taking the advice
of competent builders as to the best method to pursue
in making the repairs rendered necessary; and that the
work was well done, and the cost a reasonable one for
the character of such work, no question is made. Under
these circumstances, and it appearing that the estate
has received the full benefit of the expenditure, we think
it would be very inequitable indeed to hold the execu-
trix not entitled to a reimbursement. And it is accord-
ing to the rules and principles of equity that the acts of
an executor had in the administration of his trust are
to be adjudged. (*In re Moore*, 96 Cal. 528.) In that
case, quoting from *Matter of Niles*, 113 N. Y. 556, the
court say: "This matter of the administration of assets
of the estate is peculiarly within the cognizance of
equity, and the surrogate's court, in adjusting the ac-
counts of executors and administrators, is governed by
principles of equity as well as law. (*Upson* v. *Badeau*,
3 Bradf. 15.)

In the exercise of the statutory powers conferred upon
him, to direct and control the conduct and settle the

accounts of administrators and executors, the surrogate is not fettered, nor is he prevented by any rule of law from doing exact justice to the parties. He is supposed to administer justice in each case within his jurisdiction according as the equities of the case demand, within the confines only of statutory provisions."

Judged by these principles, we think the work done in this instance should be held to be a repairing of the premises, within the meaning of the statute, the expenditure for which appellant should have been allowed in her account. It would have been better, perhaps, as it would in any case, had the executrix first procured the permission of the probate court to make the contemplated improvement before proceeding thereto; but this is not an indispensable condition to the allowance of the demand in her account, where it appears that the expenditures were just and reasonable, and have been made in the interests of the estate. (*Estate of Moore*, 88 Cal. 1.)

It follows that the order should be reversed and the cause remanded with directions to the court below to modify its order by allowing the rejected items. It is so ordered.

HARRISON, J., and GAROUTTE, J., concurred.