[No. G043049. Fourth Dist., Div. Three. Feb. 22, 2011.]

AVALON PACIFIC—SANTA ANA, L.P., Plaintiff and Respondent, v. HD SUPPLY REPAIR & REMODEL, LLC, et al., Defendants and Appellants.

1184

**COUNSEL**

Allen Matkins Leck Gamble Mallory & Natsis, Thomas E. Gibbs and Brian R. Bauer for Defendants and Appellants.

Waldron & Bragg, Gary A. Waldron and Jacob C. Gonzales for Plaintiff and Respondent.

## OPINION

**FYBEL, J.—**

### INTRODUCTION

Avalon Pacific—Santa Ana, L.P. (Avalon), leased a parcel of real property in Santa Ana to HD Supply Repair & Remodel, LLC (HD Supply), which intended to convert the property from vacant warehouses and office space into a retail facility. After demolishing the office space, HD Supply halted renovations due to economic conditions and allowed the property to fall into disrepair. Avalon sued HD Supply and the guarantor of the lease, The Home Depot, Inc. (Home Depot), for breach of the maintenance and repair obligations of the lease and for waste. (HD Supply and Home Depot are collectively called Defendants.) However, Avalon did not terminate the lease, the initial term of which runs into 2017. HD Supply continues to pay, and Avalon continues to receive, about $50,000 a month in rent.

The jury found in favor of Avalon, and awarded it $677,000 in damages for breach of the lease against Defendants and $561,000 in damages for waste against HD Supply, both damage awards based on the cost of repairs. The trial court trebled the waste damages based on the jury's finding that HD Supply acted willfully or maliciously. Defendants appeal from the judgment in Avalon's favor.

We reverse. The most significant facts, indeed the facts driving our decision, are that Avalon has not terminated the lease, the lease has not expired, HD Supply continues to pay Avalon monthly rent of about $50,000, and, contrary to Avalon's assertion, HD Supply has not abandoned the lease. HD Supply, which remains the lessee, has the possessory interest in the leased property into at least 2017, while Avalon has a reversion interest.

Those salient facts mean that Avalon's measure of damages for breach of the maintenance and repair covenants and for waste is the diminution in value of its reversion interest. Yet Avalon sought, and the jury awarded it, cost of repair damages, the measure of damages applicable when the lease has expired or been terminated and the lessor has regained possession. By obtaining cost of repair damages without terminating the lease, while continuing to receive monthly rent, Avalon has been unjustly rewarded. Avalon is having and eating the proverbial cake.

As we explain, under the terms of the lease, California case law, and prevailing law across the nation, a lessor may not recover cost of repair damages for breach of a lease's maintenance and repair obligations when the

lease has neither expired nor been terminated. A lessor is limited to damages it actually suffered: injury to the reversion interest—the interest the lessor has in the leased property. Similarly, to recover for waste while a lease remains in effect, a lessor must prove the acts of waste caused damage that was sufficiently substantial and permanent to injure the lessor's reversion interest. The trial court erred by instructing the jury that waste need only cause substantial or permanent depreciation in market value.

Avalon did not present evidence of injury to its reversion interest. It had full and fair opportunity to do so at trial but opted instead to present evidence of cost of repairs. Accordingly, we reverse the judgment and remand with directions to the trial court to enter judgment for Defendants.

### SUMMARY OF LANDLORD/TENANT LAW

We deviate from the usual practice by first providing a brief review of some fundamentals of landlord/tenant law to provide a legal framework for understanding the facts and discussion sections of the opinion.

■ A lease is both a conveyance of an estate in real property and a contract between the lessor and the lessee for the possession and use of the property in consideration of rent. (12 Witkin, Summary of Cal. Law (10th ed. 2005) Real Property, § 517, p. 593.) " '[T]he lease has two sets of rights and obligations—one comprising those growing out of the relation of landlord and tenant, and said to be based on the "privity of estate," and the other comprising those growing out of the express stipulations of the lease, and so said to be based on "privity of contract." ' " (*Samuels v. Ottinger* (1915) 169 Cal. 209, 211 [146 P. 638].)

■ A leasehold estate gives the lessee the exclusive possession of the premises against all the world, including the owner, for the term of the lease. (*Howard v. County of Amador* (1990) 220 Cal.App.3d 962, 972 [269 Cal.Rptr. 807].) While the lessee has a present possessory interest in the premises, the lessor has a future reversionary interest and retains fee title. (*Kolstad v. Ghidotty* (1963) 212 Cal.App.2d 228, 231 [28 Cal.Rptr. 123]; see also 6 Cal. Real Estate Law and Practice (2010) Landlord and Tenant, ch. 150, § 150.02, p. 150-5 (rel. 46-3/95).) "A reversion is the residue of an estate left by operation of law in the grantor or his successors . . . commencing in possession on the determination of a particular estate granted or devised." (Civ. Code, § 768.) "A future interest entitles the owner to the possession of the property only at a future period." (*Id.*, § 690.)

■ Thus, the lessee has the right during the term of the lease to the full use and enjoyment of the leased property limited only by a restriction not to

commit waste and by the terms of the lease. (*Eastman v. Peterson* (1968) 268 Cal.App.2d 169, 174–175 [73 Cal.Rptr. 803].) Every lease includes an implied covenant of quiet enjoyment protecting the lessee from any act or omission by the lessor which interferes with the lessee's right to use and enjoy the premises for the purposes contemplated by the lease. (*Petroleum Collections Inc. v. Swords* (1975) 48 Cal.App.3d 841, 846 [122 Cal.Rptr. 114].)

### FACTS

In December 2006, HD Supply's predecessor, as tenant, and Avalon's predecessor, as landlord, entered into a long-term lease (the Lease) of the premises located at 1044 E. 4th Street in Santa Ana (the Premises). The Premises included two vacant warehouses, one of which had some interior office space. HD Supply leased the Premises with a plan to conduct major renovations to convert the warehouses into a retail facility selling building supplies to contractors. HD Supply's parent company, Home Depot, executed a written guaranty, guaranteeing HD Supply's performance under the Lease.

The term of the Lease initially was a little over 10 years, concluding in 2017, and the Lease included three five-year options to extend the term into 2032. Base monthly rent was $47,508 for the first three years, with increases to $51,783.72 for the following three years, and continual base rent increases throughout the remainder of the lease term.

Section 6 of the Lease limited HD Supply's use of the Premises to "general office, warehousing, distribution, fabrication, retail and wholesale sales and rental of building materials, construction supplies, tools, hardware, equipment and related materials, and any other legal use which is reasonably comparable thereto." Section 6 of the Lease also provided that HD Supply "shall not use or permit the use of the Premises in a manner that is unlawful, creates damage, waste or a nuisance."

The Lease stated that before its effective date, Avalon and HD Supply agreed on conceptual plans for conversion of the Premises into a retail facility. The conceptual plans included removal of a two-story office space on the north end of building A to provide a turnaround area for trucks, reconstruction of a portion of another building, and construction of a new loading dock. In addition, the Lease required HD Supply to slurry seal the parking lot and repair any damage to the asphalt. Section 4.7 of the Lease provided that HD Supply may not make material changes to the conceptual plans without Avalon's prior approval unless the changes were required by the City of Santa Ana.

Section 9.1 of the Lease sets forth HD Supply's obligations to maintain and repair the Premises. It stated: "Except as otherwise provided in this

Lease, from and after the Possession Date, [HD Supply] shall repair as necessary and maintain in good condition all parts of the Premises not [Avalon]'s responsibility in this Lease . . . , including all interior building systems, and [HD Supply] shall warrant to [Avalon] for a period of three (3) years after [HD Supply]'s completion of the Proposed Removal and the Proposed Addition, as applicable, that each of the Proposed Removal and the Proposed Addition, as applicable, is free from material defects, and [HD Supply] agrees to repair or cause to be repaired any such defects of which [HD Supply] receives notice within such three (3) year warranty period."

Section 9.3 of the Lease, which concerns HD Supply's obligations on lease termination, provided in relevant part: "[HD Supply] shall surrender the Premises by the Expiration Date or any earlier termination date, with all of the improvements, parts and surfaces, except for those which [Avalon] is obligated to maintain, broom clean and free of debris, and in good operating order, condition and state of repair, ordinary wear and tear excepted. . . . [HD Supply] shall repair any damage caused by the installation, maintenance or removal of structures, trade fixtures, furniture, equipment, systems and other personal property . . . , and [HD Supply] owned furnishings."

From December 2006 to May 2007, representatives of HD Supply and Avalon met with the City of Santa Ana Planning and Building Agency, police department, and city council to obtain necessary approvals to implement the conceptual plans. On March 26, 2007, the City of Santa Ana Planning Commission approved a variance for the Premises. However, no construction permits were obtained for the renovation project. On May 18, 2007, HD Supply prepared a notice of intent for the State Water Resources Control Board with a project completion date of December 25, 2007.

Avalon delivered possession of the Premises to HD Supply on May 15, 2007. Sometime thereafter, HD Supply commenced the renovations by removing part of the interior office space on the north end of building A. By the summer of 2007, the demand for home building and construction materials was declining and HD Supply was experiencing a significant downturn in sales at other locations. In August 2007, HD Supply suspended the renovations and notified its design and development firm it was "not going forward with construction." At the same time, HD Supply stopped construction on several other sites being developed into retail facilities.

HD Supply continued paying rent and property taxes on the Premises, and has tried unsuccessfully to sublease them.

After HD Supply ceased renovations, the Premises were vandalized and burglarized. The alarm and sprinkler systems were disabled, some skylights

were removed, fencing was cut or separated, and copper wiring, electrical systems, and bathroom fixtures were stolen. The exterior was marked with extensive graffiti. Vagrants camped inside the buildings and set fires, and Avalon was concerned the Premises would burn to the ground.

Avalon notified HD Supply of the property damage to the Premises and the presence of vagrants and sent HD Supply pictures of the Premises taken in late August 2007 showing the damage. According to Avalon, the demolition, property damage, and vandalism made the Premises unsellable and unleasable to others. Avalon did not seek to terminate the Lease.

On August 24, 2007, HD Supply executed an estoppel certificate for its lender that acknowledged: "There are broken windows that need to be repaired or boarded up as a result of continued vandalism at the property. The air conditioning parts and copper piping/wiring on the second floor of the property have been removed by vandals."

On October 24, 2007, a representative of Avalon sent an e-mail to HD Supply, stating: "As a courtesy, I am offering to speak to you by phone so I can explain more of the details behind these default issues vs. what will likely be included in the formal Notice of Default. . . . [W]e do not typically resort to a Notice of Default at such an initial stage of a Lease, but we have been unable to get any response or action out of our other [HD Supply] contacts for some time regarding what we contend are plainly [HD Supply]'s Lease obligations regarding the condition of the Premises, and the very large and increasing dollar amounts at issue clearly mean time is even more of the essence for [HD Supply] remedial action."

On November 7, 2007, Avalon served HD Supply with a notice of lease default asserting (1) "[HD Supply] has demolished a substantial and valuable portion of the Premises"; (2) "[HD Supply] has not conducted much, if any, maintenance or repair of the Premises after the Premises were delivered by [Avalon] to [HD Supply]"; (3) "[i]n the past 40 days the Premises were broken into and resulting extensive vandalism and theft occurred at the Premises, which in part caused great damage, destruction and removal of almost all electrical and other related power systems at the Premises for which [HD Supply] is obligated to restore the Premises"; and (4) "[u]nder the Lease and law [HD Supply] is obligated, but has failed, to properly secure and safeguard the Premises since the Premises were turned over to [HD Supply] by [Avalon] earlier this year."

On November 21, 2007, HD Supply provided notice that it had commenced a cure of the breaches asserted in the notice of lease default.

In December 2007, Avalon's contractors inspected the Premises and evaluated the damages from the demolition, vandalism, and theft. Repair costs were estimated at around $1.4 million, which included the cost of rebuilding the office space.

In January 2008, HD Supply entered into an agreement with a contractor to repair the Premises, clean the interior, restore the fire protection system, install fire extinguishers, board up windows, and stucco finish the exterior surface. Representatives of Avalon and HD Supply met at the Premises to review the damage. No promises were made, but HD Supply's representatives gave assurances "that things were going to change, that things would eventually get worked out and the building would get fixed up."

By April 2008, HD Supply had not secured the Premises or commenced repairs. The fire alarm and sprinkler systems remained inoperable, lighting had not been restored, and the Premises were covered in graffiti. HD Supply contended it had submitted repair plans to the City of Santa Ana. Avalon requested a copy of the plans, but HD Supply never provided one. Avalon filed this lawsuit in April 2008.

Between August 2007 and the time of trial, Avalon received about 15 notices from the City of Santa Ana to clean the Premises and was fined. In July 2008, Avalon sent to HD Supply cleanup invoices from the City of Santa Ana. HD Supply refused to pay them, stating, "[l]itigation precludes paying your bills."

In a letter to HD Supply, dated July 15, 2008, the Santa Ana city manager wrote: "For a number of months we have observed the growing deterioration of the building occupied by your company at 1044 E. Fourth Street, Santa Ana, California. The property is currently in a state of disrepair and presents a growing nuisance in our community. Graffiti covers several large walls, windows are boarded up, asphalt is beginning to degrade and landscaping is overgrown. There are several City codes for which the building is in violation."

Ultimately, HD Supply rewired the Premises with an upgraded electrical system, restored the fire alarm system and lighting, repaired the roof parking lot lights, installed circuits for exhaust fans, replaced fixtures, repainted to cover the graffiti, installed new metal doors, and cleaned the site.[1] In November 2008, HD Supply started to provide 24-hour security patrol services on the Premises. HD Supply did not attempt to restore the demolished office space or otherwise restore the Premises to the precise condition it

---

[1] HD Supply asserts it spent over $290,000 for repairs. Testimony establishes HD Supply paid over $25,000 for the alarm system and about $225,000 for electrical wiring and lighting.

had been in when renovation started because HD Supply was trying to sublease the Premises and did not know of a prospective subtenant's needs. The cost to restore the Premises to its condition at the time the Lease was signed is over $1 million.

Avalon has not terminated the Lease, which remains in effect. HD Supply continues to pay monthly rent of about $50,000.

### PROCEDURAL HISTORY

Avalon filed this lawsuit in April 2008. The operative pleading, the first amended complaint, asserted causes of action for breach of lease against HD Supply, waste and declaratory relief against Defendants, and breach of guaranty against Home Depot. The first amended complaint alleged HD Supply breached the Lease by, among other things, "demolishing a portion of the Premises, without either completing the demolition job or concluding the refurbishment of the Premises," failing to "return the Premises to their pre-existing condition or finishing the improvements contemplated when the demolition commenced," abandoning the renovation and construction work on the Premises, failing to maintain the Premises in good condition of repair, allowing the Premises to become damaged from theft and vandalism, and failing to repair damage from theft and vandalism. The first amended complaint alleged Defendants committed waste by "failing to properly secure the premises and abandoning the work of improvement midway through the job, . . . le[aving] the [P]remises available for intruders and others."

A jury trial commenced in September 2009. At the close of Avalon's case-in-chief, Defendants moved for a nonsuit. The trial court denied the motion except in one respect: The court found, "there is not an issue for the jury with regard to whether [HD Supply] had an obligation to complete the proposed renovation" because the Lease imposed no such obligation on HD Supply. The court found that HD Supply had a right, but not an obligation, to construct the proposed renovations, and concluded HD Supply had an ongoing duty to repair and maintain the Premises and Avalon could recover damages for costs of repair and waste before the Lease expired or was terminated.

The jury awarded Avalon $677,000 in damages for breach of the Lease against HD Supply, $677,000 for breach of guaranty against Home Depot, and $561,000 in damages for waste against HD Supply. On the waste cause of action, the jury found that HD Supply acted "willfully or maliciously" and, based on that finding, the trial court trebled the damages for waste, resulting in a damages award totaling $2.36 million.

After entry of judgment, Defendants filed motions for a judgment notwithstanding the verdict (JNOV) and for a new trial. The trial court denied the motions, and Defendants timely appealed from the judgment.

## DISCUSSION

## I.

### *Avalon Cannot Recover Cost of Repair Damages for Breach of the Lease Because the Lease Has Not Expired or Been Terminated.*

The jury found HD Supply breached the Lease and awarded Avalon $677,000 in breach of contract damages, representing the cost of repairs. Defendants argue the judgment on Avalon's breach of contract cause of action must be reversed on the grounds (1) HD Supply did not breach the Lease because all of the alleged breaches fell within the proposed renovations of the Premises, and (2) Avalon could not recover cost of repair damages for breach of the maintenance and repair provisions because the Lease has not expired or been terminated. The second argument has merit.

### A.

### *HD Supply Has Not Abandoned the Lease.*

Avalon's recovery of cost of repair damages is premised on the assertion HD Supply abandoned the Lease. As a matter of law, HD Supply has not abandoned the Lease. Abandonment arises when the lessee intends to permanently relinquish all rights in the leased premises. (*Lindblom v. Round Valley Water Co.* (1918) 178 Cal. 450, 455 [173 P. 994]; *Swigert v. Stafford* (1948) 85 Cal.App.2d 469, 472 [193 P.2d 106].) Under Civil Code section 1951.3, subdivision (a), real property is deemed abandoned by the lessee only if the lessor gives written notice of belief of abandonment and the lessee fails to give the lessor written notice, before the date of termination specified in the lessor's notice, stating the lessee does not intend to abandon the real property. The lessor may give notice of belief of abandonment only if rent has been due and unpaid for at least 14 consecutive days and the lessor reasonably believes the lessee has abandoned the property. (Civ. Code, § 1951.3, subd. (b).)

Avalon has not provided notice of belief of abandonment pursuant to Civil Code section 1951.3, subdivision (a). HD Supply has paid and continues to pay monthly rent of about $50,000 and other payments due under the terms

of the Lease and has spent at least $250,000 to make repairs. Avalon did serve a notice of default (trial exhibit No. 9), but has never terminated the Lease. HD Supply might not be actively using the Premises, but, as the owner of the possessory interest, HD Supply has the right to use or not use the Premises as it deems fit, so long as it complies with the Lease, does not commit waste, and does not violate the law.

## B.

### *The Evidence Supported a Finding That HD Supply Breached Terms of the Lease.*

Defendants argue that all of the breaches of the Lease asserted at trial by Avalon fell within the proposed renovations of the Premises. Because, as the trial court concluded, HD Supply had no obligation to complete the renovations, Defendants argue that "at the heart of Avalon's contract claim is the assertion that when HD Supply suspended the Proposed Renovations, it became obligated immediately to restore the Premises to its pre-Lease condition as well as to complete the painting and repaving, even though the Lease does not expire until 2017 at the earliest."

In response, Avalon asserts Defendants are putting words in its mouth. According to Avalon, it is not asserting HD Supply had an obligation to restore the Premises to their prelease condition; instead, Avalon is arguing HD Supply breached the Lease by "abandon[ing]" the Premises in a demolished state, allowing them to be vandalized and burglarized. Thus, Avalon argues, "[t]he Lease mandates that HD Supply secure the Premises, and either finish the Retail Facility, fix the Premises, or pay for the damage."

On appeal, Avalon does not appear to be arguing that HD Supply had an obligation to rebuild the demolished office space immediately on suspending the renovations.[2] (It is somewhat unclear what Avalon means by "fix the Premises.") Whether the breaches of the Lease asserted by Avalon fall within the scope of the proposed renovations is not the pertinent question: The pertinent question is whether the breaches of the Lease asserted by Avalon come within HD Supply's use, maintenance, and repair obligations set forth in the Lease.

---

[2] Avalon did make that assertion at trial. In closing argument, Avalon's counsel argued HD Supply breached the Lease by "failing and refusing to do the repair and bring the property back to its original condition."

We first examine HD Supply's repair and maintenance obligations set forth in the Lease.[3] Section 6 of the Lease provides that HD Supply "shall not use or permit the use of the Premises in a manner that is unlawful, creates damage, waste or a nuisance."

Section 9.1 of the Lease states in part: "Except as otherwise provided in this Lease, from and after the Possession Date, Tenant shall repair as necessary and maintain in good condition all parts of the Premises not Landlord's responsibility in this Lease . . . , including all interior building systems . . . ."

Section 9.2(a) states: "Tenant shall be responsible, at its sole cost, for repairing any damage to the extent caused by the actions of Tenant or any of its employees, representatives, agents or contractors (including, without limitation, as a result of any changes, additions or alterations made to the Premises by or on behalf of Tenant, including, without limitation, the Proposed Removal, the Proposed Addition or any other work performed by or on behalf of Tenant, except for any such work performed by or on behalf of Tenant pursuant to Tenant's self-help rights hereunder as a result of Landlord failing to perform any work required to be performed by Landlord hereunder)."[4]

In contrast to HD Supply's obligations to repair and maintain the Premises during the term of the Lease are HD Supply's obligations on the expiration or termination of the Lease. Section 9.3 of the Lease, which concerns HD Supply's obligations on lease termination, provides in relevant part: "Tenant shall surrender the Premises by the Expiration Date or any earlier termination date, with all of the improvements, parts and surfaces, except for those which Landlord is obligated to maintain, broom clean and free of debris, and in good operating order, condition and state of repair, ordinary wear and tear excepted. . . . Tenant shall repair any damage caused by the installation, maintenance or removal of structures, trade fixtures, furniture, equipment, systems and other personal property . . . , and Tenant owned furnishings." ·

Next, we examine Avalon's claim for breach of contract as presented to the jury. In closing argument, Avalon's counsel argued HD Supply breached the

---

[3] "The basic goal of contract interpretation is to give effect to the parties' mutual intent at the time of contracting. [Citations.] When a contract is reduced to writing, the parties' intention is determined from the writing alone, if possible. [Citation.] 'The words of a contract are to be understood in their ordinary and popular sense.' [Citations.]" (*Founding Members of the Newport Beach Country Club v. Newport Beach Country Club, Inc.* (2003) 109 Cal.App.4th 944, 955 [135 Cal.Rptr.2d 505].)

[4] The Lease defines "breach" as "a failure by Tenant to comply with or perform any of the terms, covenants or conditions of this Lease" and defines "default" to include "[a] violation by Tenant as to the terms, covenants, conditions or provisions of this Lease . . . where such violation continues for a period of thirty (30) days after written notice."

Lease by (1) not removing demolition debris; (2) leaving broken windows boarded up; (3) not repaving the parking lot; (4) allowing the landscaping to become overgrown; (5) failing to secure the Premises from theft, vandalism, and graffiti; (6) leaving the demolished office space "unrepaired, unfixed, and [i]noperable"; (7) failing to maintain and paint the buildings, and only "touch-paint[ing]" over the graffiti; and (8) modifying the Premises by demolishing the office space, which reduced the value of the Premises. As a result, Avalon's counsel argued the Premises were "unleasable" and "uns[el]lable."

The conduct described might constitute breaches of HD Supply's maintenance and repair obligations under the Lease. We agree with the trial court that nothing in the Lease required HD Supply to complete the proposed renovations. We also find nothing in the Lease requiring HD Supply to restore the Premises to prelease condition at any time before expiration or termination of the Lease. As Defendants argue, section 9.3 of the Lease protects Avalon from incomplete renovations by requiring HD Supply to surrender the Premises "with all of the improvements, parts and surfaces, except for those which Landlord is obligated to maintain, broom clean and free of debris, and in good operating order, condition and state of repair" and to "repair any damage caused by the installation, maintenance or removal of structures, trade fixtures, furniture, equipment, systems and other personal property."

But, once HD Supply commenced the proposed renovations by demolishing the office space, HD Supply could be in breach of the maintenance, repair, and waste obligations depending on the nature and degree of damage caused by the demolition and whether HD Supply removed debris. In addition, HD Supply left broken windows boarded up, allowed the parking lot asphalt to deteriorate, allowed the landscaping to become overgrown, and failed to secure the Premises from theft, vandalism, and graffiti. As a result, the Premises were stripped of copper wiring, fixtures were stolen, and graffiti covered the buildings. HD Supply thus failed to "repair as necessary and maintain in good condition all parts of the Premises."

C.

*Cost of Repair Damages for Breach of Maintenance and Repair Covenants Are Not Recoverable During the Lease Term.*

Defendants challenge the jury verdict and judgment on the ground Avalon could not recover cost of repair damages for breach of the covenants to maintain and repair the Premises because the Lease had not expired or been

terminated. Cost of repair damages, Defendants argue, are not recoverable by a lessor during the lease term for breach of maintenance and repair covenants. We agree.

We start by emphasizing that Avalon has not terminated the Lease, and its term does not expire until at least 2017, at which time HD Supply has an option, the first of three, to renew for an additional five years. HD Supply has not repudiated or abandoned the Lease; to the contrary, HD Supply continues to pay monthly rent of about $50,000. As the Lease remains in effect, HD Supply has the present right of possession of the Premises, while Avalon has a reversion interest.

 1. *The Lease Does Not Authorize Avalon to Recover Cost of Repair Damages Without Terminating the Lease.*

As we have explained, sections 9.1 and 9.2(a) of the Lease impose obligations on HD Supply to maintain and repair the Premises during the Lease term. The Lease does not permit Avalon to recover cost of repair damages without terminating the Lease. Section 14.2 of the Lease, entitled "Remedies" (boldface omitted), states in part: "If Tenant shall at any time be in default under this Lease beyond applicable cure periods, then Landlord shall be entitled, at its election, to bring suit for the collection of the rent or other amounts for which Tenant may be in default, or for the performance of any other covenant or agreement devolving upon Tenant, all without entering into possession or terminating this Lease. In addition to the foregoing, if Tenant shall at any time be in default under this Lease beyond applicable cure periods, then Landlord shall be entitled, at its election, to terminate this Lease, re-enter the Premises and take possession thereof."

Under the first sentence of section 14.2 of the Lease, the landlord has the right, without terminating the Lease, to (1) sue the tenant "for the collection of the rent or other amounts for which Tenant may be in default" or (2) sue the tenant "for the performance of any other covenant or agreement devolving upon Tenant." HD Supply was not in default of payment of rent or of any amount it was required to pay under the terms of the Lease. At oral argument, Avalon's counsel asserted the term "other amounts for which Tenant may be in default" includes the cost of repair when the lessee is in default of the maintenance and repair covenants. We disagree. Under a reasonable construction of the Lease, the phrase "other amounts for which Tenant may be in default" under section 14.2 means specific monetary obligations imposed by the Lease on the lessee.

To enforce the nonmonetary covenants of the Lease, such as maintenance and repair obligations, without terminating the Lease, Avalon's remedy under

section 14.2 of the Lease was to sue HD Supply for specific performance. Avalon did not seek specific performance of any provision of the Lease.

> 2. *California Statutory and Case Law Do Not Permit a Lessor to Recover Cost of Repair Damages Without Terminating the Lease.*

■ Interpreting the Lease as not permitting the lessor to recover cost of repair damages without terminating the Lease is consistent with California law governing a lessor's remedies for breach of a lease. Civil Code section 1951.2, subdivision (a) provides, in relevant part: "[I]f a lessee of real property breaches the lease and abandons the property before the end of the term or if his right to possession is terminated by the lessor because of a breach of the lease, the lease terminates. *Upon such termination,* the lessor may recover from the lessee: [¶] (1) The worth at the time of award of the unpaid rent which had been earned at the time of termination; [¶] (2) The worth at the time of award of the amount by which the unpaid rent which would have been earned after termination until the time of award exceeds the amount of such rental loss that the lessee proves could have been reasonably avoided; [¶] (3) Subject to subdivision (c), the worth at the time of award of the amount by which the unpaid rent for the balance of the term after the time of award exceeds the amount of such rental loss that the lessee proves could be reasonably avoided; and [¶] (4) *Any other amount necessary to compensate the lessor for all the detriment proximately caused by the lessee's failure to perform his obligations under the lease or which in the ordinary course of things would be likely to result therefrom.*" (Italics added.) Subpart (4) of section 1951.2, subdivision (a) includes costs incurred in making repairs the lessee was required to make, and damages for the lessee's breach of a covenant to maintain or improve the property or to restore the premises on termination of the lease. (Legis. Com. com., 10 West's Ann. Civ. Code (2010 ed.) foll. § 1951.2, p. 125.)

Civil Code section 1951.2, subdivision (a) permits the lessor to recover cost of repair damages "[u]pon such termination" of the lease. The Lease, consistent with section 1951.2, subdivision (a), does not permit the lessor to recover cost of repair damages without terminating the Lease.

■ California case law permits recovery of cost of repair damages *after* the lease has expired or been terminated. In *Iverson v. Spang Industries, Inc.* (1975) 45 Cal.App.3d 303, 308 [119 Cal.Rptr. 399], the court stated: "The relief to be awarded a prevailing lessor for breach of a covenant to restore the premises may be based upon one of three possible measures: The cost of restoring the premises, the diminution in the market value of the premises, or specific performance of the covenant. (Comment, *Breach of a Covenant to Restore* (1966) 39 So.Cal. L.Rev. 309, 309–310.) In the majority of jurisdictions, including California, the restoration principle is employed; i.e., where

an action is brought after expiration of a term for breach of a lessee's covenant to keep the premises in repair or to surrender them in good repair or in a specified condition, the measure of damages is the reasonable cost of putting the demised premises into the required state of repair or the condition contemplated by the covenant. (80 A.L.R.2d 983, 1001; 49 Am.Jur.2d, Landlord and Tenant, § 979, p. 951; *Gold Min. & Water Co.* [*v.*] *Swinerton* (1943) 23 Cal.2d 19, 38 [142 P.2d 22]; see also *Sprague* [*v.*] *Fauver* (1945) 71 Cal.App.2d 333, 337 [162 P.2d 865].) An allowance may also be made for the loss of rental during the reasonable time required to make such repairs or restoration. (*Worthington* [*v.*] *Kaiser Foundation Health Plan, Inc.* (1970) 8 Cal.App.3d 435, 442 [87 Cal.Rptr. 272]; cf. *Linforth* [*v.*] *S.F. Gas and Electric Co.* (1909) 156 Cal. 58, 62 [103 P. 320]; 49 Am.Jur.2d, Landlord and Tenant, § 958, p. 934.)" (See also *Polster, Inc. v. Swing* (1985) 164 Cal.App.3d 427, 432–433 [210 Cal.Rptr. 567], quoting *Iverson v. Spang Industries, Inc., supra,* 45 Cal.App.3d 303.)

██ In *Gold Min. & Water Co. v. Swinerton, supra,* 23 Cal.2d at pages 25–26 (*Gold Mining*), the lessor and lessees entered into a mining lease requiring the lessees to restore, maintain, and repair the water system. The lessees failed to restore and repair the water system before repudiating the lease (*id.* at pp. 23–24), and the California Supreme Court upheld an award of repair costs to the lessor (*id.* at p. 43). The court expressed the rule that after expiration or termination of the lease, the landlord may recover cost of repair damages for the tenant's breach of maintenance and repair covenants. (*Id.* at pp. 37–38.) Quoting 32 American Jurisprudence, Landlord and Tenant, section 801, the court recognized the general rule that injury to the reversion is the measure of damages when the lease has not expired or been terminated: " 'Where, during the continuance of the tenancy, the landlord brings an action for the breach of a covenant to repair by the tenant, the measure of damages is generally held to be the amount by which the reversion is injured on account of the property being out of repair. It would not be fair or just, particularly where the lease has a long time to run, to take the amount necessary to put the premises into repair as the measure of the damages; for in such cases, when the damages are awarded to the landlord, he is not bound to expend them in repairs, nor can he do so without the tenant's permission to enter on the premises.' " (*Gold Mining, supra,* at pp. 37–38.) Although the lease had not expired or been terminated, the lessees had repudiated it. Therefore, the *Gold Mining* court concluded: "In the case of a mining lease such as is here involved, where there has been a failure to perform and a repudiation by the lessees, the rule to be applied should be the same as where the term has expired; that is, the lessor is entitled to recover the reasonable cost of the improvements or repairs which the lessees agreed to make under the terms of the lease." (*Id.* at p. 38.)

■ *Gold Mining* endorses the rule that a landlord may recover cost of repair damages only in a lawsuit brought after the lease has expired or been terminated; before then, the landlord's damages are limited to the amount of injury to the reversion. The *Gold Mining* court permitted the lessor to recover the cost of repair only because the lessees had repudiated the lease, in effect terminating it. (*Gold Mining, supra*, 23 Cal.2d at p. 38.) We are bound by *Gold Mining* because it is a California Supreme Court decision. (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455 [20 Cal.Rptr. 321, 369 P.2d 937].) As HD Supply has not repudiated the Lease, and it has neither expired nor been terminated, Avalon may not recover cost of repair damages.

Avalon argues *Brown v. Green* (1994) 8 Cal.4th 812 [35 Cal.Rptr.2d 598, 884 P.2d 55] (*Brown*) and *Strecker v. Barnard* (1952) 109 Cal.App.2d 149 [240 P.2d 345] (*Strecker*) support recovery of cost of repair damages before expiration or termination of the lease. The issue decided in *Brown* was whether the lessor or the lessees of a commercial lease bore the responsibility for complying with an abatement order issued by a county department of health services requiring the immediate remediation of asbestos on the premises. (*Brown, supra*, 8 Cal.4th at pp. 816–817.) The court concluded, based on the lease terms and six other factors, that the lessees assumed responsibility for removing the asbestos. (*Id.* at p. 834.) The *Brown* court did not address whether a lessor may recover cost of repair damages for breach of maintenance and repair covenants before expiration or termination of the lease.

The court in *Strecker, supra*, 109 Cal.App.2d at pages 150–151, faced the similar issue whether the lessor or lessee was responsible for complying with a notice of the Division of Industrial Safety, requiring an elevator on the premises to be brought within state safety regulations. The lessee sued for a declaration setting forth the rights and obligations of the parties under the lease. (*Id.* at p. 150.) The lease included covenants requiring the lessee to comply with all laws, to maintain and repair the premises, and specifically to keep all elevators in good order and condition. (*Id.* at p. 153.) Based on those lease provisions, the Court of Appeal concluded the lessee had the duty to comply with the notice and provide for the safe operation of the elevator. (*Id.* at pp. 154–155.) The court did not address whether a lessor may recover cost of repair damages before expiration or termination of the lease.[5]

---

[5] Avalon asserts the lessors in *Strecker* were awarded cost of repair damages of $1,490. That is not correct. The trial court in *Strecker* ruled the lessee had the duty to make the required repairs to the elevator to make it safe and "fixed the cost thereof at $1,490." (*Strecker, supra*, 109 Cal.App.2d at p. 151.)

### 3. ·The Vast Majority of Cases from Other Jurisdictions Does Not Permit a Lessor to Recover Cost of Repair Damages Without Terminating the Lease.

The Lease, Civil Code section 1951.2, subdivision (a), and California case law are consistent with the general rule, followed throughout the nation, that a lessor may not recover cost of repair damages for breach of the lessee's maintenance and repair obligations before the lease has expired or been. terminated. American Jurisprudence Second states: "Where, during the term of the tenancy, the landlord brings an action for the breach of a covenant by the tenant to repair or improve, the measure of damages is generally held to be the amount by which the reversion is injured on account of the property being out of repair, or the difference between the value of the premises with the repairs or improvement and without the repairs or improvement. The rationale for the rule has been variously stated: that it would not be fair, particularly where the lease has a long time to run, to take the amount necessary to put the premises into repair as the measure of the damages, for the landlord is not bound to expend it in repairs, nor can the landlord do so without the tenant's permission to enter on the premises. Further, the lessee could find it necessary to make the same repairs for which he or she has already paid the lessor." (49 Am.Jur.2d (2006) Landlord and Tenant, § 722, p. 692, fns. omitted.) "The measure of the damages to which a lessor is entitled for a lessee's breach of a covenant as to repairs has usually been considered to depend upon whether the action is commenced before or after the expiration of the lease term. Where the action is brought during the term of the lease, most courts have recognized, as a general rule, that the proper measure of such damages is the amount by which the lessor's reversion is injured by the lack of repair . . . ." (Annot., Measure and Elements of Damages for Lessee's Breach of Covenant as to Repairs (2009) 45 A.L.R.5th 251, § 2[a] (Annotation).)

The vast majority of cases from across the country follows the rule that a lessor may not recover cost of repair damages during the lease term for breach of maintenance and repair covenants. (See *Winrow v. Marriott Corp.* (1989) 230 N.J. Super. 189, 192 [553 A.2d 59, 60] ["where an action for breach of a covenant to repair is brought during the term of the lease, the measure of damages is the injury to the lessor's reversion. If the action is brought after the expiration of the lease, the authorities agree, the measure of damages is the cost of repair"]; *National Bank of Detroit v. Estate of Voigt* (1959) 357 Mich. 647, 653 [99 N.W.2d 504, 507] ["In an action begun before termination of the lease, [injury to reversion], not cost of repairs, is the measure of damages."]; *Bloom v. The Southern Amusement Co.* (1955) 228 La. 44, 51–52 [81 So.2d 763, 766] ["although the obligation on the part of the lessee to make repairs exists during the whole term of the lease, the lessor's right to damages in the event the lessee fails to make repairs does not accrue

until the property is restored to the owner at the expiration of the lease"]; *Nelson v. City of Seattle* (1934) 180 Wn. 1, 33 [38 P.2d 1034, 1046] ["The general rule is that a covenant to make repairs is not breached until the expiration of the term. Therefore, an action on the covenant does not lie until the term ends."]; *Giordano v. Brandywine Mushroom Corp.* (1963) 32 Pa. D. & C.2d 522, 525 [11 Chest.Co. 424] ["courts have recognized that the rule of cost of repair will produce overpayment in some cases, and that when that result is produced, another rule will be applied"]; *Middendorf v. Fuqua Industries, Inc.* (6th Cir. 1980) 623 F.2d 13, 18 (*Middendorf*) ["where a landlord sues before the end of the term of a lease for breach of a covenant to repair, the measure of damages is the injury to the reversion rather than the cost of repairs"]; *Siegler v. Robinson* (Tex.Civ.App. 1980) 600 S.W.2d 382, 386 ["where there are no permanent injuries to the premises, the landlord is entitled to the reasonable cost of repairs as the proper measure of damages if he waits until after the term of the lease has expired"]; *McLane v. Wal-Mart Stores, Inc.* (Mo.Ct.App. 2000) 10 S.W.3d 602, 604 ["When the lease term has expired, the lessor's recovery for breach of a covenant to repair or for failure to surrender possession of the premises in a prescribed condition is usually the cost of making the repairs to restore the property to the required condition."]; see also Annot., *supra*, 45 A.L.R.5th 251, § 3[a] [collecting cases].)

In *Pennsylvania Cement Co. v. Bradley Contracting Co.* (2d Cir. 1926) 11 F.2d 687, 688, Judge Learned Hand confirmed that under New York state law, "pending the term, a lessor may not recover the cost of repairs upon default by the lessee upon a covenant to keep the tenement in repair, but is confined to the difference in value of the reversion." Judge Hand explained that awarding the cost of repairs during the lease term would overcompensate the lessor: "[I]f the lease has not ended, the present cost . . . would give [the lessor] the equivalent of the improvements in a condition in which he would not be entitled to them. He would get them only after they had been aged by the duration of the lease, and at best he must prove that they would not be of less value then than now. This is presumably the reason for the rule in the case of repairs. [¶] . . . To allow the lessor to recover the cost would therefore put him in a better position than he could under any possibility have occupied, had the lessee fully performed." (*Ibid.*)

The justification for the rule that the lessor may not recover damages for the cost of repairs during the lease term has been summarized as follows: "The basic rationale for this rule is that it would not be fair to award the lessor the cost of repairs in this situation because he or she is not bound to expend the money on repairs, and because the allowance of the present cost of such repairs would give him or her a windfall, since otherwise the lessor would not rightfully come into possession of the demised premises until the expiration of the lease term, after the value of repairs made during the term

has substantially declined . . . . It has also been observed in support of the rule that the lessor's entitlement to cost-of-repair damages during the lease term is entirely speculative, because the lessee may make the necessary repairs before the lease expires . . . ." (Annot., *supra*, 45 A.L.R.5th 251, § 2[a], citation omitted.)

In denying Defendants' posttrial motions and permitting Avalon to recover cost of repair damages, the trial court relied on the following sentence from *Gold Mining*: " 'In some cases, however, it has been held that a landlord is entitled to recover the cost of putting the premises in proper repair, although the action is brought by him before the termination of the lease.' " (*Gold Mining, supra*, 23 Cal.2d at p. 38, quoting 32 Am.Jur., Landlord and Tenant, § 801.) The cases cited by 49 American Jurisprudence Second (2010) Landlord and Tenant, section 722, in support of that proposition are *Corbett v. Derman Shoe Co.* (1959) 338 Mass. 405 [155 N.E.2d 423] (*Corbett*), *Publishers Building Co. v. Miller* (1946) 25 Wn.2d 927 [172 P.2d 489] (*Miller*), and *Gold Mining*.

In *Corbett, supra*, 155 N.E.2d 423, the landlord brought the lawsuit while the lease was in effect, but terminated the lease before trial, by which time the repairs still had not been made. The *Corbett* court affirmed the rule that "[t]he reasonable cost of repairs is the measure of damages where the action is brought after the end of the term" (*id.* at p. 428) and recognized the rule "that, pending the term, the lessor may recover the diminution in the market value of his estate" (*id.* at p. 429). But since the lease had terminated by the time of trial, the court found it would not be unjust to allow the landlord to recover cost of repair damages: "The term having ended and no repairs having been made by the lessee under its continuing obligation, the lessors, so far as a rule for measuring damages is concerned, are in substantially the position of a lessor who has brought his action after the term has ended." (*Id.* at p. 429.)

In *Miller, supra*, 172 P.2d 489, a boiler on the leased premises was found to be cracked and inoperable. An employee of the lessee notified the lessor's agent, who had the boiler repaired at the lessor's expense. (*Id.* at p. 491.) The lessor sued the lessee to recover the cost of repairs. The issue at trial and on appeal was which party—the lessor or lessee—was responsible for the cost of repairs under the terms of the lease. (*Ibid.*) The Washington Supreme Court concluded only that the lessee was liable for the expense incurred by the lessor to repair the boiler. (*Id.* at p. 496.) As HD Supply points out, *Miller* is consistent with the exception that a landlord who actually pays for repairs may recover the cost from the tenant during the lease term. (See *Glickman v. De Berry* (Tex.Ct.App. 1928) 11 S.W.2d 367 ["Where, however, the landlord has made the repairs, or the lease has expired, the rule is that the covenant to

repair renders the tenant 'liable to the extent of the amount required to do what he covenanted to do, but did not do.' "].) Indeed, in *Nelson v. City of Seattle, supra,* 38 P.2d at page 1046, the Washington Supreme Court stated: "The general rule is that a covenant to make repairs is not breached until the expiration of the term. Therefore, an action on the covenant does not lie until the term ends."

The trial court also cited *Harts v. Arnold Brothers* (1925) 318 Ill. 416 [149 N.E. 420]. In that case, the court held the landlord's measure of damages for breach of the covenants to maintain and repair depended on the language of the lease. The court stated: "[T]he parties by the terms of the lease recognize the right of the tenant to make changes on condition that he restore the premises at the close of the tenancy, such agreement must be held to prevent the application of the rule as to measure of damages. In such a situation the landlord is not entitled to recover, during the term of the tenancy, for any damage except that resulting to the reversion. Such damage, if any, is the difference between the market value before and after the changes were made." (149 N.E. at p. 421.) The trial court here relied on this statement from *Harts:* "Defendant in error has cited numerous cases holding that the proper measure of damages is the cost of restoring the premises to the condition in which they were before the waste was committed. These cases, however, have been those either where the landlord has made repairs and sued for re-imbursement, or where the tenant has, when called upon, refused to restore the property to its former state, or cases arising under breaches of covenants to repair . . . ." (*Ibid.*) This statement is dictum because the *Harts* court based its decision on the terms of the lease.

Avalon argues that "nationally courts recognize a landlord's right to enforce a repair covenant during the term." It is undisputed that a lessor may sue to enforce maintenance and repair covenants during the lease term; the issue is what *remedy* the lessor may receive—specific performance, injury to the reversion interest, and/or cost of repair damages. In support of the proposition the lessor may recover the full cost of repairs, Avalon cites *Middendorf, supra,* 623 F.2d 13; *Corbett, supra,* 155 N.E.2d 423; *McKinney v. White Sewing Machine Corp.* (Ct.App. 1964) 95 Ohio LawAbs. 368 [200 N.E.2d 596] (*McKinney*); *Ed Miller & Sons, Inc. v. Earl* (1993) 243 Neb. 708 [502 N.W.2d 444]; *Waddell v. DeJet* (1898) 76 Miss. 104 [23 So. 437]; *Creekmore v. Redman Industries, Inc.* (1983) 1983 Okla.Civ.App. 32 [671 P.2d 73] (*Creekmore*); and *JIHL Associates v. Frank* (N.Y.App.Div. 1988) 137 A.D.2d 655 [524 N.Y.S.2d 749].

As discussed, both *Corbett, supra,* 155 N.E.2d 423, and *Middendorf, supra,* 623 F.2d 13, affirmed the rule that during the lease term, the lessor may only recover diminution in market value of the reversion interest for breach of a

repair covenant. In *McKinney, supra*, 200 N.E.2d 596, the lessors made the repairs to the leased premises while in possession after expiration of the lease term. The appellate court affirmed an award of cost of repair damages to the lessors on the principle that a landlord may recover the amount the landlord spent making repairs falling within the lessee's repair obligation. (*Id.* at p. 601.)

In *Ed Miller & Sons, Inc. v. Earl, supra*, 502 N.W.2d 444, 451, the Nebraska Supreme Court recognized the rule that "[g]enerally, in a lessor's suit brought before expiration of a lease's term, the measure of damages for a lessee's breach of a covenant to repair the leased premises is the reduction in value of the lessor's reversion, that is, the difference in the value of the premises with and without the repairs." The court upheld an award of cost of repair damages because the evidence showed it was less than the amount of reduction in value of the reversion, "[t]hus, damages awarded on the basis of the premises' diminished value would have provided an award significantly greater than an award based on the cost of repair." (*Ibid.*) The cost of repairs provided "a reasonably accurate measure of damages" and did not result in a windfall recovery for the lessor. (*Ibid.*)

In *Waddell v. DeJet, supra*, 23 So. 437, the court held the lessee had to make the required repairs or face cancellation of the lease. The case did not address damages.

Finally, in *JIHL Associates v. Frank, supra*, 524 N.Y.S.2d 749, 750, the appellate court held the cost of repair damages instead of damage to the reversion interest was the proper measure of the lessor's damages because the leased premises, comprising two movie theaters, "suffered deterioration and vandalism as a result of the closing and abandonment by [lessee]." The trial had resulted in termination of the lease. (*Ibid.*) *JIHL Associates v. Frank* thus is similar to the *Gold Mining* case, in which the court approved cost of repair damages because the lessees had repudiated the lease. In this case, HD Supply had neither abandoned the Premises nor repudiated the Lease.

One case Avalon cites arguably supports cost of repair damages before the expiration or termination of the lease. In *Creekmore, supra*, 671 P.2d 73, the lessees asserted on appeal that the trial court erred by permitting the lessors to maintain an action for waste before the end of the lease term. The Oklahoma Court of Appeals concluded, "a landlord may maintain an action for want of repair before the end of the term" and, therefore, "[the lessors'] action for damages for waste can be maintained prior to the expiration of the lease agreement." (*Id.* at p. 78.) Citing *Ellison v. Walker* (1955) 1955 Okla. 86 [281 P.2d 931], a nonlease case, the *Creekmore* court concluded the lessors' damages were the reasonable costs of repairing the property or restoring it to

its former condition. (*Creekmore, supra*, 671 P.2d at p. 79.) We cannot reject the terms of the Lease, California law, and the vast majority of decisions from other jurisdictions, in favor of a single, questionable 1983 decision of the Oklahoma Court of Appeals.

■ The cases in which cost of repair damages have been permitted before the end of the lease term for breach of a repair covenant have involved the specific circumstances previously described, or have relied on particular lease terms, "which were deemed to call for an exception to the general rule that the measure of damages in this situation is the diminution in the value of the lessor's reversion . . . ." (Annot., *supra*, 45 A.L.R.5th 251, § 4[a].) In summary, the cases allowing an exception to the general "no-cost-of-repairs" rule fall into these categories: (1) the cost of repairs is less than the diminution in value of the reversion (*Ed Miller & Sons, Inc. v. Earl, supra*, 502 N.W.2d 444); (2) the lessee was no longer in possession of the leased premises at the time the damages were computed or had repudiated the lease (*Gold Mining, supra*, 23 Cal.2d 19; *Corbett, supra*, 155 N.E.2d 423; *JIHL Associates v. Frank, supra*, 524 N.Y.S.2d 749); (3) the lessor made the repairs at the lessor's own expense and sought reimbursement from the lessee (*Miller, supra*, 172 P.2d 489; *Glickman v. De Berry, supra*, 11 S.W.2d 367); (4) after the lease had terminated, the lessor took possession and made the repairs (*McKinney, supra*, 200 N.E.2d 596); and (5) immediate repairs were mandated by governmental authority (Annot., *supra*, 45 A.L.R.5th 251, § 4[e]; cf. *Strecker, supra*, 109 Cal.App.2d at pp. 150–151). In those situations, the justifications for the no-cost-of-repairs rule did not apply—the lessor would not receive a windfall, the lessor had the ability to go on the property to make the repairs or had made the repairs, and the entitlement to cost of repair damages was not speculative because it was certain the lessee would not make or had not made the repairs. Except possibly for No. (5),[6] none of these exceptions is relevant here.

Avalon argues recovery of the cost of repair damages is necessary to prevent default under its loan secured by the Premises. As Defendants argue, Avalon cannot provide citations to evidence in support of that argument because the loan documents are not part of the record. Avalon also argues that HD Supply's refusal to make the repairs left Avalon with no choice but to commence this lawsuit. Avalon could have sought, but did not seek, the remedy of specific performance to compel HD Supply to make the repairs or to permit Avalon to go on the Premises to make them.

---

[6] Between August 2007 and the time of trial, Avalon received about 15 notices from the City of Santa Ana to clean the premises and was fined. HD Supply refused to pay the invoices. Those invoices arguably constitute government-mandated repairs for which Avalon could obtain damages as reimbursement. Avalon did not itemize the amounts of those invoices.

### 4. *Avalon Failed to Present Evidence of Injury to Its Reversion Interest.*

Defendants argue the better rule precludes a lessor from recovering damages for injury to the reversion interest because such damages are speculative. HD Supply acknowledges a split of authority on that issue. A few courts have held a cause of action for breach of the maintenance and repair covenants does not accrue until the lease is terminated; in other words, the lessor may not recover any damages—either cost of repairs or diminution in value of the reversion—until the lease has expired or been terminated. (See *Bloom v. The Southern Amusement Co., supra,* 81 So.2d 763 [lessor's action for damages brought before lease termination is premature]; *Nelson v. City of Seattle, supra,* 38 P.2d 1034 [action for damages on the covenant to make repairs is inconsistent with the theory the lease had not expired or been terminated].) The majority of cases permits the lessor to recover during the lease term the diminution in value of the reversion interest caused by the lessee's breach of the maintenance and repair covenants. (See Annot., *supra,* 45 A.L.R.5th 251, § 3[a] [collecting cases].)

We need not decide that issue because Avalon did not present evidence at trial of damage to its reversion interest. Avalon did present testimony the Premises could not be sold or leased in its present condition. That testimony did not segregate injury to the reversion interest, did not calculate the monetary value of the injury to the reversion interest, and failed to take into consideration the fact the Premises were already subject to the Lease, which continues to generate about $50,000 in monthly rent and extends at least into 2017.

 The only damages sought by Avalon and awarded on its breach of contract claim were for the cost of repairs. Avalon is not entitled to a new trial to prove some other measure of damages because it had " ' "full and fair opportunity to present the case, and the evidence is insufficient as a matter of law to support [Avalon]'s cause of action . . . ." ' " (*Frank v. County of Los Angeles* (2007) 149 Cal.App.4th 805, 833 [57 Cal.Rptr.3d 430].) " ' "Certainly, where the plaintiff's evidence is insufficient as a matter of law to support a judgment for plaintiff, a reversal with directions to enter judgment for the defendant is proper. . . . [¶] . . . [A] reversal of a judgment for the plaintiff based on insufficiency of the evidence should place the parties, at most, in the position they were in after all the evidence was in and both sides had rested." ' " (*Ibid.*)

### 5. *Conclusion.*

 Based on the terms of the Lease, Civil Code section 1951.2, subdivision (a), California case law, and the majority of case law from other

jurisdictions, we hold Avalon was not entitled to recover cost of repair damages for any breaches by HD Supply of the covenants to maintain and repair the Premises. The Lease has not expired or been terminated, and HD Supply has neither abandoned the Premises nor repudiated the Lease. HD Supply continues to pay, and Avalon continues to receive, about $50,000 in rent each month. Recovery of cost of repair damages would overcompensate Avalon, which has no obligation to spend the damages on the repairs, and it is entirely possible that HD Supply will make the repairs by the time the Lease expires in 2017.

When Avalon and Defendants had rested at trial, no evidence had been presented of diminution in value of Avalon's reversion interest caused by any breaches of the maintenance and repair covenants in the Lease. Accordingly, Avalon failed to prove damages. We therefore conclude the jury verdict and judgment awarding Avalon cost of repair damages are erroneous.

## II.

### *Avalon Cannot Recover for Waste.*

The jury awarded Avalon $561,000 in damages for waste, based on the cost of repairs. The trial court denied Defendants' motion for a new trial and motion for a JNOV on the waste cause of action, rejecting the argument that Defendants' conduct did not constitute waste as a matter of law. Defendants argue the judgment on the waste cause of action must be reversed because (1) as a matter of law, they cannot be liable for waste because HD Supply had the right to demolish the office space on the premises, and (2) the trial court erroneously instructed the jury that to establish waste Avalon had only to prove HD Supply "created a condition that substantially *or* permanently diminished or depreciated" the Premises' market value. (Original underscoring, italics added.)

### A.

### *HD Supply Engaged in Conduct That Could Result in Waste.*

**(12)** " '[W]aste is conduct (including in this word both acts of commission and of omission) on the part of the person in possession of land which is actionable at the behest of, and for protection of the reasonable expectations of, another owner of an interest in the same land. . . . Thus, waste is, functionally, a part of the law which keeps in balance the conflicting desires of persons having interests in the same land.' [Citation.]" (*Cornelison v. Kornbluth* (1975) 15 Cal.3d 590, 597–598 [125 Cal.Rptr. 557, 542 P.2d 981].)

"[W]aste is defined as 'an unlawful act or omission of duty on the part of a tenant, resulting in permanent injury to the [property].' [Citations.]" (*Old Republic Ins. Co. v. Superior Court* (1998) 66 Cal.App.4th 128, 149 [77 Cal.Rptr.2d 642], disapproved on another ground in *Vandenberg v. Superior Court* (1999) 21 Cal.4th 815, 838–839 [88 Cal.Rptr.2d 366, 982 P.2d 229].) "In order to state a cause of action for waste, a plaintiff must plead and prove that the defendant was under a duty to preserve and protect the property involved." (*Old Republic Ins. Co. v. Superior Court, supra*, at p. 149.)

Relying on *Bomberger v. McKelvey* (1950) 35 Cal.2d 607 [220 P.2d 729], Defendants argue HD Supply did not commit waste as a matter of law because the Lease gave HD Supply the right to make the proposed renovations, including the demolition of the office space. In *Bomberger v. McKelvey*, the defendants purchased 12 lots of real property for the purpose of constructing a building and parking facilities. (*Id.* at p. 610.) Two of the lots were improved by a structure leased to the Hills, and the lease was assigned to the defendants in exchange for payment of money. The plaintiffs agreed to demolish the existing structure on the two lots and build a new structure elsewhere for the Hills, and the defendants agreed to pay the plaintiffs $3,500 when demolition was completed. (*Ibid.*) Due to governmental restrictions, the defendants were not able to obtain the material needed to build the new structure and parking facilities. (*Id.* at p. 611.) They notified the plaintiffs not to proceed with demolition of the old structure because construction of the new building was not contemplated in the near future. The plaintiffs proceeded to demolish the old structure, claiming that materials from the old structure were needed to construct the new building for the Hills. (*Ibid.*) When demolition was completed, the defendants refused to pay the plaintiffs the agreed-upon amount. (*Id.* at p. 612.)

The plaintiffs sued the defendants, and the defendants cross-complained against the Hills, alleging they committed waste by permitting the plaintiffs to demolish the old structure on the property. (*Bomberger v. McKelvey, supra*, 35 Cal.2d at p. 619.) The California Supreme Court concluded the waste claim had no merit because "plaintiffs had an irrevocable license to enter and a right to tear down the building, enforceable by specific performance, and it cannot be said that the Hills are guilty of waste because of plaintiffs' rightful actions in demolishing the building . . . ." (*Id.* at p. 620.)

Here, the Lease states that "Landlord and Tenant have agreed on conceptual plans . . . for Tenant's Work, the Proposed Removal and the Proposed Addition," thereby granting HD Supply the right to demolish the office space. But, as the trial court found, HD Supply had a right to demolish the office space only as part of the renovations and conversion of the Premises to a retail facility. The trial court stated: "I don't think there's anything in the

lease that would allow the tenant to demolish a portion and then say, well, that's part of what's allowed, and so we can stop right there." HD Supply was not contractually obligated to complete or even start the renovations; however, having stopped short of completion after demolishing the office space, HD Supply could be in violation of maintenance and repair obligations under the Lease or the provision prohibiting HD Supply from using the Premises "in a manner that is unlawful, creates damage, waste or a nuisance."

In addition, Avalon's waste cause of action was not based solely on the demolition of the office space. Avalon also alleged Defendants committed waste by "failing to properly secure the premises and abandoning the work of improvement midway through the job, . . . le[aving] the [P]remises available for intruders and others." The evidence established the Premises had been stripped of copper wiring, fixtures had been stolen, windows were boarded up, and the landscaping became overgrown.[7]

### B.

*Avalon Failed to Show Injury to Its Reversion Interest and Cannot Recover Cost of Repair Damages for Waste While the Lease Remains in Effect.*

1. *To Recover for Waste, Avalon Had to Prove Damage Sufficiently Substantial and Permanent to Cause Injury to Its Reversion Interest.*

To recover for waste, a plaintiff must prove injury *to the reversion interest.* (12 Witkin, Summary of Cal. Law, *supra*, Real Property, § 371, p. 435.) Where, as in this case, the lease has not expired or been terminated, damages from waste must be sufficiently substantial and permanent to cause injury to a reversion interest that may not become a possessory interest for many years. Avalon cannot recover damages for waste because it failed to prove injury to its reversion interest.

The trial court instructed the jury that to establish waste, Avalon had to prove that HD Supply "created a condition that substantially *or* permanently diminished or depreciated the market value of the Premises." (Italics added.) In denying Defendants' motion for a JNOV, the trial court, citing *Rowe v. Wells Fargo Realty Services, Inc.* (1985) 166 Cal.App.3d

---

[7] In closing argument, Avalon's counsel stated the cost of repairing the parking lot and the cost of repainting the buildings covered by graffiti were not included in damages for waste because those repair costs were being claimed as damages for HD Supply's alleged breaches of the maintenance and repair provisions of the Lease.

310, 319 [212 Cal.Rptr. 374] (*Rowe*), stated, "[f]urther, California law supports the instruction to the jury that the injury to the premises must be 'permanent *or* substantial.' " (Italics added.)

Defendants argue the jury instruction on waste was erroneous because injury to the premises must be permanent *and* substantial to constitute waste. " 'The propriety of jury instructions is a question of law that we review de novo.' " (*Chicago Title Ins. Co. v. AMZ Ins. Services, Inc.* (2010) 188 Cal.App.4th 401, 418 [115 Cal.Rptr.3d 707].) We agree with Defendants the jury instruction was erroneous.

■■■ The gist of a waste claim is acts by the tenant causing injury to the lessor's reversion interest or the inheritance. "To constitute waste, there must be an injury to the inheritance (C[iv]. C[ode, §] 818), substantially depreciating the market value of the property." (12 Witkin, Summary of Cal. Law, *supra*, § 371, p. 435; see also Civ. Code, § 818 ["The owner of a life estate may use the land in the same manner as the owner of a fee simple, except that he must do no act to the injury of the inheritance."]; *Silva v. Garcia* (1884) 65 Cal. 591, 592 [4 P. 628] ["The entry upon the land, and digging up and removing the fruit trees growing thereon, constituted waste in the eye of the law, as it was an injury to the inheritance."]; *Brennan v. Gaston* (1861) 17 Cal. 372, 374 [waste "goes to the destruction of the inheritance"]; *Hicks v. Michael* (1860) 15 Cal. 107, 116 ["the lord of a manor may, in respect of his manorial rights, obtain an injunction against trespass, in the nature of waste, which goes to deprive him of part of the substance of his inheritance"].)

What constitutes an injury to the reversion interest or inheritance? Some cases have examined whether the injury is permanent. "[W]aste is defined as 'an unlawful act or omission of duty on the part of a tenant, resulting in permanent injury to the [property].' [Citations.]" (*Old Republic Ins. Co. v. Superior Court, supra*, 66 Cal.App.4th at p. 149.) "[Waste] has also been defined as an unlawful act or omission of duty on the part of a tenant which results in permanent injury to the inheritance. The word is not an arbitrary term to be applied inflexibly without regard to the quantity or quality of the estate, the nature and species of property, or the relation to it of the person charged to have committed the wrong." (*Southern Pacific Land Co. v. Kiggins* (1930) 110 Cal.App. 56, 60–61 [293 P. 708].)

Other cases have required proof of diminution of the market value of the property to establish waste. Some cases speak of "substantial depreciation" of the market value of the property: "Injury to the inheritance, which under the common law would be termed 'waste' can only be proved, with the possible exception of a few instances, by evidence of acts which injuriously affect the market value of the property. . . . [T]he question as to whether the tenant has

committed acts of waste or injury to the inheritance is determined by proof only of conduct which has resulted in substantial depreciation of the market value of the land." (*Sallee v. Daneri* (1942) 49 Cal.App.2d 324, 327 [121 P.2d 781].) " '[A] life tenant possesses a somewhat free hand in the manner in which he uses the land, and his right of enjoyment is limited only by such action as results in injury to the inheritance. Injury to the inheritance, which under the common law would be termed "waste" can only be proved, with the possible exception of a few instances, by evidence of acts which injuriously affect the market value of the property. The owner of an estate in reversion may not subject a life tenant to damages for every act which does not meet with the approval of the reversioner. Section 818 of the Civil Code requires that there be an injury to the "inheritance." As indicated, the question as to whether the tenant has committed acts of waste or injury to the inheritance is determined by proof only of conduct which has resulted in substantial depreciation of the market value of the land. [Citation.]' " (*Eastman v. Peterson, supra*, 268 Cal.App.2d 169, 175–176, quoting *Sallee v. Daneri, supra*, 49 Cal.App.2d at p. 327.)

Other cases have concluded that waste requires permanent diminution in value of the property: "Waste will be found only when the market value of property is permanently diminished or depreciated." (*Smith v. Cap Concrete, Inc.* (1982) 133 Cal.App.3d 769, 777 [184 Cal.Rptr. 308] (*Smith*).) "[W]hile a life tenant is entitled to the full use and enjoyment of his life estate the only restriction upon such use is that the estate of the remainderman shall not be permanently diminished in value by the life tenant's neglecting to do what an ordinarily prudent person would do in preserving his own property." (*Bliss v. Security-First Nat. Bank* (1947) 81 Cal.App.2d 50, 55 [183 P.2d 312].)

From these various definitions and tests, one fundamental principle stands out: Waste is injury to the lessor's reversion interest, not to the lessee's present possessory interest. Indeed, while a lease is in effect, the only damage a lessor could suffer from waste is injury to the reversion interest because that is the interest the lessor has in the property. To cause injury to the reversion interest, damage from waste likely would have to be both substantial and permanent, particularly when there is a long period remaining on the lease term; in other words, waste occurs when damage is sufficiently substantial and permanent to cause an injury to the reversion interest.

"Permanent" does not inflexibly mean eternal; instead, "permanent" means a degree of irremediableness sufficient to cause injury to a reversion interest that will not become a possessory interest until the end of the lease term. For example, in *Richards v. Silveria* (1929) 97 Cal.App. 166, 168 [275 P. 478], the lessors leased 79 acres to the lessee for a term of 10 years. The lease included a covenant prohibiting the lessee from committing waste.

During the lease term, the lessee plowed up 20 acres of bunch grass pasture, and bunch grass is perennial and cannot be produced from artificial seeding. (*Ibid.*) The Court of Appeal, affirming a judgment of waste against the lessee, concluded the destruction of the pasture grass constituted waste and reduced the market value of the property. (*Id.* at p. 169.) Bunch grass presumably could grow back, but only over a period of time, and the loss of the grass could not be repaired through seeding.

Avalon did not present evidence of injury to its reversion interest resulting from HD Supply's acts of waste. As we have explained, although Avalon presented testimony the Premises could not be sold or leased in its present condition, that testimony did not segregate injury to the reversion interest or place any monetary value on injury to that interest, and failed to take into consideration the fact the Premises were already subject to the Lease.

The "substantially *or* permanently diminished" test used in the jury instruction and urged by Avalon on appeal is erroneous because it could permit recovery for, or forfeiture based on, waste without establishing injury to the reversion interest. The "substantially or permanently diminished" test might permit a claim of waste to be based on remediable damage which, though "substantial" on a subjective level, causes no proven injury to the reversion interest.

We agree too with Defendants that the "substantially or permanently diminished" test is of questionable pedigree. In *Rowe, supra*, 166 Cal.App.3d at pages 314–315, a landlord sued for unlawful detainer and termination of the lease on the ground the tenant committed waste by repeatedly tampering with the plenum temperature control of the heating and air conditioning system. (*Ibid.*) The Court of Appeal concluded the complaint failed to state a cause of action for unlawful detainer based on waste, stating: "An action for damages resulting from waste can only be proved ' "by evidence of acts which injuriously affect the market value of the property." ' [Citation.] Such evidence must show that the market value is substantially *or* permanently diminished or depreciated. [Citation.]" (*Id.* at p. 319, italics added.) The tenant's conduct in tampering with the temperature controls "would not cause depreciation of the premises nor a substantial decrease in its market value such that a forfeiture of the lease is warranted." (*Id.* at p. 320.)

In support of the proposition that market value must be substantially or permanently diminished to constitute waste, the *Rowe* court cited *Smith, supra*, 133 Cal.App.3d 769. As noted, in *Smith*, the court stated, "[w]aste will be found only when the market value of property is permanently diminished or depreciated." (*Smith, supra*, at p. 777.) The *Smith* court did not hold that waste is established where market value is either substantially or permanently diminished.

As Defendants point out, only two reported decisions after *Rowe* use the "substantially or permanently diminished" standard: *Dieterich Internat. Truck Sales, Inc. v. J. S. & J. Services, Inc.* (1992) 3 Cal.App.4th 1601 [5 Cal.Rptr.2d 388] (*Dieterich*) and *Freeze v. Brinson* (1991) 3 Cal.App.4th Supp. 1 [5 Cal.Rptr.2d 227]. *Dieterich* was not a waste case, but addressed the issue whether a prescriptive easement could be obtained against a landlord reversioner. (*Dieterich, supra,* 3 Cal.App.4th at p. 1608.) In resolving that issue, the court considered whether a landlord, who is without a possessory interest, could bring an action to prevent the creation of a prescriptive easement. (*Id.* at pp. 1608–1611.) The *Dieterich* court considered the analogous situation of waste, for which a landlord, though not in possession, may recover for injury to the inheritance. (*Id.* at p. 1609.) The *Dieterich* court gave a summary of the law of waste that included the disjunctive definition of *Rowe,* but concluded that, unlike waste, a prescriptive easement constituted an injury to the right of possession, not the right of ownership. (*Dieterich,* at pp. 1609–1610.) Because a nonpossessory landlord could not bring an action to prevent the creation of a prescriptive easement, no prescriptive easement could arise against a nonpossessory landlord. (*Id.* at p. 1611.) The disjunctive definition of waste played no role in the *Dieterich* court's decision.

In *Freeze v. Brinson, supra,* 3 Cal.App.4th Supp. 1, 2–3, the trial court rendered judgment in favor of a landlord in an unlawful detainer action on the ground the tenant committed waste by leaving the premises in an unclean and unsanitary condition. The appellate department of the Los Angeles Superior Court, quoting *Rowe*'s disjunctive definition of waste, emphasized "[t]he required proof is expressly worded in the alternative" and, therefore, "proof of either substantial *or* permanent diminution in market value will suffice." (*Freeze,* at p. Supp. 4.) The *Freeze* court ultimately did not rely on the disjunctive test because it reversed the unlawful detainer judgment by finding the landlord failed to present evidence the damages caused by the tenants substantially or permanently diminished the market value of the premises as a whole. (*Ibid.*)

### 2. *Avalon Cannot Recover Cost of Repair Damages for Waste While the Lease Remains in Effect.*

Avalon argues that repairable damage might constitute waste, and that a lessor may recover cost of repair damages for waste while the lease is in effect. None of the authorities cited by Avalon supports that proposition. The Miller and Starr treatise cited by Avalon states that if the tenant commits waste, the landlord can terminate the lease if the tenant fails to make repairs within a reasonable time after a request, "and can recover the same damages for the breach of the covenant to repair." (7 Miller & Starr, Cal. Real Estate (3d ed. 2001) § 19:130, p. 403 (rev. 8/2004).) In *Southern Pacific Land Co. v.*

*Kiggins, supra,* 110 Cal.App. 56, 57–58, the landowner entered into a contract of sale for the property with Kiggins, who in turn entered into a contract with a third party to remove gravel from the property. Kiggins forfeited the contract by failing to make payments on it, but the third party went ahead and removed 41,000 tons of gravel from the property. (*Id.* at p. 58.) The Court of Appeal held the landowner could recover damages for waste for the removal of the gravel. (*Id.* at pp. 60–61.) In *Isom v. Book* (1904) 142 Cal. 666, 667 [76 P. 506], the plaintiff rescinded a lease after learning the lessees fraudulently extracted oil deposits from the property and recovered damages for waste from the lessees. The California Supreme Court held the trial court did not abuse its discretion in refusing to treble those damages. (*Id.* at pp. 668–669.)

Avalon argues *Kanner v. Globe Bottling Co.* (1969) 273 Cal.App.2d 559 [78 Cal.Rptr. 25] (*Kanner*) supports cost of repair damages for waste. In that case, the lessor sued the lessee for breach of the lease and waste, alleging the lessee left the premises in a state of disrepair upon lease expiration. (*Id.* at pp. 562–563.) The trial court found the lessee breached the maintenance and repair covenants of the lease by failing to leave the premises in a clean condition and by failing to make repairs upon lease expiration and awarded cost of repair damages. (*Id.* at p. 564.) The lessor appealed, contending the trial court erred by finding that some claimed damages were for ordinary wear and tear and therefore were not recoverable, and by refusing to award damages, including treble damages, for waste. (*Id.* at pp. 564–565, 568.) The appellate court affirmed. (*Id.* at p. 569.) The court did not address whether cost of repair damages could be recovered for waste because the basis of the damages award was the lessee's breach of the maintenance and repair covenants of the lease. On appeal, the lessor argued he was entitled to damages for waste because the lessee committed waste as a matter of law. The appellate court conceded, for purposes of argument, the lessee committed waste but concluded the lessor was not entitled to treble damages. (*Id.* at p. 568.)

In *Kanner,* the lessor sued the lessee after the lease had expired. (*Kanner, supra,* 273 Cal.App.2d at p. 562.) Thus, *Kanner* could be read at most as authorizing cost of repair damages for waste only once the lease has expired or been terminated. But, as we explained, the *Kanner* court did not address that issue.

One case that Avalon relies on—*Smith, supra,* 133 Cal.App.3d 769—did authorize cost of repair damages for waste. In that case, a subtenant allowed a construction company to dump significant amounts of broken concrete material on the property as fill. (*Id.* at p. 773.) The property owners sued the construction company, apparently only for trespass. At trial, it was stipulated

the cost to remove the concrete material was $6,000. (*Ibid.*) The trial court concluded the property owners could not recover damages for trespass because they did not have possession of the property when the trespass occurred. (*Id.* at p. 774, fn. 3.) The Court of Appeal agreed the property owners' lack of actual or constructive possession precluded recovery for trespass, but concluded the property owners could recover for waste for injury to their ownership interest. (*Id.* at pp. 774–775.)

The Court of Appeal in *Smith, supra*, 133 Cal.App.3d at pages 775–777, recited law that waste is injury to the inheritance and will be found "only when the market value of property is permanently diminished or depreciated" (*id.* at p. 777). Although the broken concrete material could be removed, the Court of Appeal concluded the property owners could recover for waste, stating: "[T]he record amply supports a finding that appellants' ownership interest is substantially and permanently devalued by the presence of the concrete fill left by respondent. . . . [¶] . . . The damage we discern is palpable. Depreciation of the market value of the property in its present condition can easily be inferred from the stipulated facts, and if the concrete is not removed, will clearly be permanent. This suffices to establish waste." (*Id.* at pp. 777–778.) Finally, the court concluded: "Whether viewed as an action for trespass or waste, respondent's unauthorized interference with appellants' ownership rights requires redress in the form of damages for loss of market value or cost of removal." (*Id.* at p. 778.)

There are ways, and Defendants offer some, to distinguish *Smith* from this case and to make sense of its reasoning. The opinion does not mention what happened to the tenant or subtenant; thus Defendants posit "they were long gone" (underscoring omitted) and the landowners had regained the possessory interest by the time of trial. Because the landowners had recovered possession, the damage from the broken concrete material had become permanent and thereby recoverable in damages for waste. Also, the *Smith* opinion does not reveal the value of the property. Removal costs of $6,000 do not seem unusually large compared to the repair costs sought by Avalon, but it is entirely possible that in *Smith* the cost of removal represented a substantial portion of, or even exceeded, the property value. Under those circumstances, the *Smith* court's comments that depreciation in market value "can easily be inferred" (*Smith, supra*, 133 Cal.App.3d at pp. 777–778) make better sense.

While those readings of *Smith* are plausible, we must read the lines, not between them, and *Smith* did permit a lessor to recover cost of repair damages for waste. *Smith* is not binding on us, and we do not find it persuasive for several reasons. As mentioned in the preceding paragraph,

several critical facts are missing from the *Smith* opinion, preventing us from determining whether the case applies to the situation here, in which the lessor sued for waste without terminating the lease. We also find the reasoning of *Smith* questionable. The *Smith* court accurately recited California law on waste but then applied that law in a circular fashion, concluding the broken concrete material would become permanent if not removed. (*Smith, supra*, 133 Cal.App.3d at p. 778.) In support of the proposition the landowners could recover for loss of market value or cost of removal, the *Smith* court cited cases involving the measure of tort damages for trespass—*Rogers v. Duhart* (1893) 97 Cal. 500 [32 P. 570] and *Don v. Trojan Construction Co.* (1960) 178 Cal.App.2d 135 [2 Cal.Rptr. 626].

Finally, Avalon argues, "[t]here is a legion of California cases supporting the repair cost as the appropriate remedy for damage to real property." But the cases Avalon cites in support of that assertion involve trespass or negligent damage to property. (*Natural Soda Prod. Co. v. City of L. A.* (1943) 23 Cal.2d 193 [143 P.2d 12] [trespass]; *Menzies v. Geophysical Service, Inc.* (1953) 116 Cal.App.2d 419 [254 P.2d 51] [trespass]; *Kell v. Jansen* (1942) 53 Cal.App.2d 498 [127 P.2d 1033] [negligent damage to property]; *Dandoy v. Oswald Bros. Paving Co.* (1931) 113 Cal.App. 570 [298 P. 1030] [trespass].)

As waste is by definition injury to the lessor's reversion interest, a lessor's damages for waste are the amount by which the reversion interest is injured. When the lease has not expired or been terminated, and the lessee remains in possession of the property, damages for waste based on the cost of repairs present the same problems as do cost of repair damages for breach of maintenance and repair covenants: the lessor would receive a windfall because the lessor is not required to make the repairs and may not be able to go on the property to make them. If the waste is remediable, either by repair or passage of time, the waste might be cured by the time the lease expires and the lessor retakes possession.

Avalon, of course, has not terminated the Lease, nor has it expired. To recover for waste, Avalon was required to prove HD Supply's action caused injury to Avalon's reversion interest. Avalon presented no evidence establishing diminution in value of its reversion interest. Instead, Avalon sought and obtained cost of repair damages for waste. Avalon therefore failed to prove waste.

Because we conclude Avalon cannot prove waste, we do not need to address whether Avalon could recover treble damages.

## Disposition

The judgment is reversed and the matter is remanded with directions to enter judgment in favor of Defendants, who are to recover costs incurred on appeal.

Bedsworth, Acting P. J., and Moore, J., concurred.

A petition for a rehearing was denied March 21, 2011, and respondent's petition for review by the Supreme Court was denied May 11, 2011, S191866. Corrigan, J., did not participate therein.